UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GARRY MICHEL,

                              Petitioner,

              v.

UNITED STATES OF AMERICA,

                              Respondent.

Case No. 13-CV-4258 (KMK)
Case No. 09-CR-815 (KMK)

OPINION & ORDER

<u>Appearances</u>

Garry Michel
Middletown, NY
*Pro Se Petitioner*

Benjamin R. Allee
U.S. Attorney's Office, White Plains
White Plains, NY
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

        Garry Michel ("Petitioner"), proceeding pro se, brings a Petition for Writ of Habeas

Corpus, pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence ("Petition").

For the reasons stated herein, the Petition is dismissed.

I.  Background

        Petitioner was arrested on February 11, 2009 based on a criminal complaint (the

"Criminal Complaint") charging him with money laundering and conspiracy to distribute

ketamine.  (*See* Compl. (Dkt. No. 2).)[1]  On August 25, 2009, Petitioner was indicted in three

counts.  Count One charged Petitioner with conspiring to distribute and possess with intent to

_____

        [1] All docket citations refer to the docket in case number 09-CR-815, unless otherwise
noted.

distribute ketamine between in or about March 2007 and May 2008, in violation of 21 U.S.C.

§ 846.  (*See* Indictment (Dkt. No. 16).)  Count Two charged Petitioner with laundering the

proceeds of the narcotics distribution charged in Count One by structuring monetary transactions

to avoid bank reporting requirements, also between March 2007 and May 2008, in violation of

18 U.S.C. §§ 1956(a)(1)(B)(ii) and 2.  (*Id.*)  Count Three charged Petitioner with being a felon in

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  (*Id.*)  The Indictment also

included forfeiture allegations as to the ketamine conspiracy and money laundering counts.  (*Id.*)

On December 8, 2009, the Government filed a prior felony information, pursuant to 21 U.S.C.

§ 851, which increased the maximum sentence for Count One from five to ten years'

imprisonment.  To represent him, Petitioner retained two attorneys, Andrew Rubin, Esq. and

Thomas Kenniff, Esq.  (*See, e.g.*, Dkt. (minute entry Aug. 28, 2009); Notice of Appearance (Dkt.

No. 21).)

On January 27, 2010, Petitioner pled guilty to all three charges in the Indictment.  (*See*

Dkt. (minute entry Jan. 27, 2010).)  Prior to his plea, Petitioner received from the Government a

so-called *Pimentel* letter setting forth the Government's view regarding the sentencing exposure

Petitioner faced if convicted of all three counts, including the applicable United States

Sentencing Guidelines ("Guidelines") range.[2]  (Pet'r's Mem. of Law in Supp. of Pet. ("Pet'r's

Mem.") Ex. 2 (Dkt. No. 2, 13-CV-4258 Dkt.).)  In this letter, the Government calculated the base

offense level to be 28, based on offense conduct involving between 400,000 to 700,000 units of

ketamine.  *See* U.S.S.G. § 2D1.1(c)(6).  Because the offense level for the conduct charged in

---

[2] In *United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991), the Second Circuit
suggested that prosecutors inform defendants contemplating a guilty plea about "the likely range
of sentences that their pleas will authorize under the Guidelines."  *Id.* at 1034.

Count One was 28, pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level for the money laundering offense charged in Count Two also was 28. Two levels were added because the offense conduct involved a violation of 18 U.S.C. § 1956, yielding a total offense level of 30. The resulting Guidelines Range (after accounting for acceptance of responsibility and Petitioner's criminal history) was estimated to be 78 to 97 months.

At the plea, Petitioner stated, under oath, that he was satisfied with his legal representation, (Plea Hr'g Tr. 11 (Jan. 27, 2010 Hr'g)), and admitted that he was guilty of conspiring to distribute and possess with intent to distribute unspecified quantities of ketamine, (*id.* at 38–41), that he engaged in financial transactions designed to conceal the proceeds of the ketamine distribution conspiracy (*id.* at 41–46), and that he possessed a firearm and ammunition after being convicted of a felony, (*id.* at 46–49).

Petitioner was first sentenced on January 11, 2011.[3] Prior to and during sentencing, counsel for Petitioner argued for a below-Guidelines sentence based on Petitioner's attempted cooperation, his family circumstances, his medical history, and his relative culpability. (Sentencing Hr'g Tr. 6–27 (Jan. 11, 2011 Hr'g).) Counsel also addressed the forfeiture issue. (*Id.* at 27–37.) In particular, counsel explained how he had convinced the Government not to

---

[3] There were several requests to adjourn the sentence, some from Petitioner's counsel and one from the Government. When Petitioner's counsel sought adjournments, they explained that their requests were driven by the need to investigate mitigating factors or to resolve forfeiture issues without a hearing. (*See* Letter of Andrew A. Rubin, Esq. to the Court, May 10, 2010 (Dkt. No. 25); Letter of Andrew A. Rubin, Esq. to the Court, July 21, 2010 (Dkt. No. 26); Letter of Andrew A. Rubin, Esq. to the Court, Sept. 8, 2010 (Dkt. No. 27).) One adjournment was sought because of a trial conflict. (*See* Letter of Andrew A. Rubin, Esq. to the Court, Nov. 1, 2010 (Dkt. No. 28).) The Government also sought an adjournment to address the potential forfeiture of Petitioner's residence. (*See* Letter of Assistant United States Attorney Benjamin Allee, to the Court, Dec. 6, 2010 (Dkt. No. 30).)

forfeit Petitioner's house (where Petitioner had stored drug paraphernalia, drug proceeds, and ammunition). (*Id.* at 28–29.) In lieu of forfeiting Petitioner's house, the Government and Petitioner agreed to a forfeiture order in the amount of $752,000, which reflected the amount of narcotics proceeds that Petitioner helped to launder. (*Id.* at 29.) In the course of this discussion, counsel acknowledged that "using not a very sharp pencil, I can get to that number[, $752,000,] just by going or something close to that number by going over the deposit slips that the Government had provided me." (*Id.*)

The Court imposed a sentence of 78 months' imprisonment, to be followed by four years' supervised release (three years on Counts Two and Three; four years on Count One). (*Id.* at 67; *see also* Judgment (Dkt. No. 43).) In imposing this sentence, the Court acknowledged Petitioner's cooperation attempts, his family circumstances, his medical issues, and his relative culpability. (Sentencing Hr'g Tr. at 57–67.) The primary factor that led the Court to impose the sentence it did was Petitioner's repeat performance; to wit, that he had been convicted for selling ketamine soon after a previous conviction for the same conduct. (*Id.* at 61–62.) Regarding forfeiture, the Court deferred that decision to give counsel for both sides an opportunity to discuss the matter. Ultimately, the Government and Petitioner agreed on a forfeiture order in which the Government did not forfeit Petitioner's residence and in which the Government agreed to deduct from the outstanding money judgment the amount of the funds it recovered from Petitioner's residence and the value of a car the Government seized. Petitioner and his counsel signed the consent forfeiture order. (*See* Forfeiture Order (Dkt. No. 44).)

On March 14, 2011, the Second Circuit held that a prior driving while ability impaired ("DWAI") conviction does not necessarily count for purposes of calculating a defendant's

4

criminal history. *United States v. Potes-Castillo*, 638 F.3d 106, 110–13 (2d Cir. 2011). In the wake of this decision, and at the Court's request, counsel for Petitioner argued for a reduction in the sentence, because one of Petitioner's criminal history points arose from a DWAI conviction. (*See* Letter of Andrew A. Rubin, Esq. to the Court, Mar. 25, 2011 ("Mar. 25 Rubin Letter") (Dkt. No. 32); Letter of Andrew A. Rubin, Esq. to the Court, Apr. 15, 2011 (Dkt. No. 35).) During this time, counsel also advised the Court that Petitioner had complained about his legal representation. (*See* Mar. 25 Rubin Letter.)

On June 1, 2011, the Court granted the request of counsel to be relieved and appointed new counsel (Paul Rinaldo, Esq.) to represent Petitioner. (*See* Dkt. (minute entry May 16, 2011); Order (Dkt. No. 36).) New counsel appealed the sentence on, among other grounds, that Petitioner's criminal history category should have been lower in light of *Potes-Castillo*. (*See* Pet'r's Brief on Appeal (Dkt. No. 23, 11-3868 2d Cir. Dkt.).) On a motion from the Government, the Second Circuit remanded Petitioner's sentence to address what effect the *Potes-Castillo* decision had on Petitioner's criminal history category. (*See* Mot. To Vacate J. (Dkt. No. 35, 11-3868 2d Cir. Dkt.); Order (Dkt. No. 52, 11-3868 2d Cir. Dkt.).)

The Court re-sentenced Petitioner on October 9, 2012. Before the re-sentencing, Petitioner wrote the Court on July 12, 2012 to advise the Court about, among other things, the substandard medical treatment he claimed he had been receiving at FCI Fort Dix and the assault he suffered at the hands of another inmate and a corrections officer. (*See* Letter of Garry Michel to the Court, July 22, 2012 (Dkt. No. 62).) These same issues were discussed at the re-sentencing, where the Court made clear that it believed it had the discretion to consider the issues raised by Petitioner, and was not limited to consideration only of the impact of a re-calculated

5

criminal history.  (Re-Sentencing Hr'g Tr. 16–17, 22–23, 27 (Oct. 9, 2012 Hr'g) (Dkt. No. 79)).)

Indeed, Petitioner spoke on his own behalf at sentencing and raised his medical care while in

prison.  He did not say anything about the prior prison assault.  (*Id.* at 19–20.)  While the Court

calculated Petitioner to be in Criminal History Category I as a result of *Potes-Castillo*, (*id.* at 21),

the Court imposed the same 78-month sentence it previously imposed, (*id.* at 28).  In doing that,

the Court explicitly considered all the factors under 18 U.S.C. § 3553(a), including Petitioner's

points about the assault and his medical issues, along with other claims he made and that were

made on his behalf.  (*Id.* at 25–27.)

Petitioner subsequently filed the instant Petition.

## II.  Discussion

Petitioner seeks to be re-sentenced on the claim that all three of his trial lawyers were

constitutionally ineffective because (i) they failed to argue that Petitioner did not launder at least

$752,080 in ketamine distribution proceeds and did not sell at least 400,000 units of ketamine,

(ii) they failed to ask for a below-Guidelines sentence due to Petitioner's pre-sentence

confinement difficulties, and (iii) they erred in advising Petitioner to agree to the consent order

of forfeiture.  (*See* Pet'r's Mem. 18–25; Am. Pet. 2 (Dkt. No. 71).)  Furthermore, Petitioner

claims, for the first time in his Reply Memorandum, that his trial lawyers were ineffective for

failing to move to suppress the fruits of the Government's use of a GPS tracking device on his

car in 2008.  (*See* Pet'r's Reply Mem. of Law in Supp. of Pet. ("Pet'r's Reply") 1–3 (Dkt. No.

76).)

A.  Standard of Review

1.  Section 2255

A prisoner in federal custody may move to vacate, set aside or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).[4]  "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted); *see also Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (same); *Rodriguez v. United States*, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013) (same).

---

[4] Title 28 U.S.C. § 2255(a) provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). Moreover, a hearing is not required where the petitioner's allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962). To justify a hearing, the petition must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle the petitioner to relief. *See Gonzalez*, 722 F.3d at 131.

## 2. Ineffective Assistance

Claims of ineffective assistance of counsel are evaluated under the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the [petitioner] must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the [petitioner] must show that the deficient performance prejudiced the defense." *Id.*

A petitioner will not meet the first prong based solely on disagreements with counsel's strategy or advice. Indeed, there is a "strong presumption" that counsel's conduct fell within the vast spectrum of reasonable assistance, and it is the petitioner's burden to demonstrate "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Bonilla v. Lee*, 35 F. Supp. 3d 551, 575 (S.D.N.Y. 2014) (same); *Henderson v. Martuscello*, No. 10-CV-5135, 2013 WL 6463348, at *15 (S.D.N.Y. Dec. 10, 2013) (same). Thus, to satisfy this prong, a petitioner must demonstrate that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."

8

*Strickland*, 466 U.S. at 687.  In assessing counsel's conduct, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690) (citation omitted).

To satisfy the second prong, a petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also McNaught v. United States*, 646 F. Supp. 2d 372, 378 (S.D.N.Y. 2009) (same).  Measuring this probability depends on the context of the alleged error.  In the sentencing context, a petitioner must demonstrate that but for counsel's ineffective assistance, a different sentence was probable.  *See United States v. Workman*, 110 F.3d 915, 920 (2d Cir. 1997); *United States v. Gallo-Lopez*, 931 F. Supp. 146, 150 (N.D.N.Y. 1996) (dismissing habeas corpus petition because petitioner failed to establish that the sentence would have been different if counsel had made other arguments in support of a downward departure).  "In considering an ineffective counsel claim, a court need not accept a petitioner's uncorroborated, self-serving testimony as true." *Grullon v. United States*, No. 99-CV-1877, 2004 WL 1900340, at *6 (S.D.N.Y. Aug. 24, 2004), *reconsideration denied*, 2005 WL 1560479 (S.D.N.Y. June 28, 2005).

B.  Analysis

1.  Offense Conduct

As noted, Petitioner claims his trial attorneys were ineffective because they did not contest the offense conduct that resulted in the base offense level calculated by the Probation

Department (and adopted by the Court).  (*See* Pet'r's Mem. 1, 18–24.)  In particular, Petitioner claims that his counsel should have challenged the determination that the offense conduct involved the distribution of at least 400,000 units of ketamine and approximately $752,080 in money laundering transactions.  (*Id.* at 18–24.)  This claim is meritless.

In calculating the base offense level, the Probation Department grouped the narcotics conspiracy and money laundering counts.  Per § 2S1.1 of the Guidelines, the offense level for the underlying offense from which the laundered funds were derived was to be applied because Petitioner participated in the underlying narcotics conspiracy.  *See* U.S.S.G. § 2S1.1.  Thus, turning to the guideline for narcotics distribution, the Probation Department determined that the base offense level was 28 because the offense conduct involved between 400,000 and 700,000 units of ketamine.  *See id.* § 2D1.1(c)(6).  Because Petitioner also was convicted of violating 18 U.S.C. § 1956, there was a two-level enhancement.  *See id.* § 2S1.1(b)(2)(B).  This yielded an adjusted offense level of 30.  However, three levels were taken off to reflect Petitioner's timely acceptance of responsibility.  *See id.* §§ 3E1.1(a)–(b).[5]

---

[5] It is important to note that had Petitioner just been sentenced for the money laundering charge, the Guidelines calculation would have been the same.  The base offense level would have been 8, and it would have been adjusted up by 14 levels because the total amount of money laundering transactions was $752,080, by the cross-reference to the Guidelines provision covering theft, property destruction, and fraud.  S*ee* U.S.S.G. § 2S1.1(a)(2) (providing for a base offense level of 8, plus the number of levels corresponding to the value of the laundered funds, as found in § 2B1.1); *id.* § 2B1.1(b)(1)(H) (providing for a 14-level increase for financial transactions valued between $400,000 and $1,000,000).  Plus, there would have been a 6-level increase to reflect the fact that Petitioner engaged in the financial transactions knowing that they were intended to promote a narcotics distribution conspiracy, *see id.* § 2S1.1(b)(1), and a 2-level increase to reflect that Petitioner was convicted under 18 U.S.C. § 1956, *see id.* § 2S1.1(b)(2)(B). This all results in the same total offense level (30) Petitioner faced for the narcotics conspiracy (before accounting for the acceptance-of-responsibility adjustment, which would apply to both).

Petitioner claims that he advised his counsel that the ketamine quantities attributed to him in the *Pimentel* letter, and later in the Presentence Investigation Report (the "PSR"), were excessive. (Pet'r's Mem. 18.) While he asserts that he admitted to his attorneys that he and his wife had made "a number of deposits into the suppliers' bank accounts, and that he received certain shipments of ketamine from California," the quantities "on both matters" were far less than what was alleged. (*Id.*) The basis of Petitioner's claim is that the distributors from California would have had to ship approximately three boxes (containing 300 vials each) per week to Petitioner and his cohorts for eight consecutive months, for a total of 96 boxes, meaning that law enforcement officers, who intercepted 13 shipments, would have missed approximately 83 shipments during their investigation. (*Id.* at 21.)[6] According to Petitioner, the 13 shipments were worth approximately $150,000, the amount that one of the sellers claimed in May 2008 was deposited by Petitioner into the bank accounts of the seller and his associates. (*Id.* at 22.) From this, Petitioner evidently draws the inference that he was responsible for selling only $150,000 worth of ketamine (which Petitioner says equates to approximately 72,000 units). (*Id.*) By not challenging the ketamine quantity calculation in the PSR, based on Petitioner's own analysis of the evidence, Petitioner claims that his lawyers were constitutionally ineffective. (*Id.* at 21–24.)

In the face of Petitioner's suppositions and guess-work, the Government has offered concrete proof of the scope of Petitioner's conduct. To begin, the Government was able to directly connect more than just 13 seized packages to Petitioner. As detailed in the PSR, shipping records alone demonstrate that the ketamine suppliers in California shipped 23

───────────────

[6] Law enforcement personnel intercepted approximately 13 such shipments from a location in California to a residence in West Nyack, New York, and a residence in Yonkers, New York. (*See* Presentence Investigation Report ¶¶ 21–25.)

11

packages to various residences associated with Petitioner in Middletown, West Nyack, and

Yonkers.  (Presentence Investigation Report ("PSR") ¶¶ 14–16, 19–25; Compl. ¶¶ 8–14.)

Moreover, law enforcement personnel seized $40,000 from Petitioner on September 28, 2007

(approximately eight months before the $150,000 worth of ketamine-related deposits in May

2008), after he met with an individual who later that day sold 100 bottles of ketamine and whose

residence was found to contain 1,500 vials of ketamine.  (PSR ¶¶ 16–18.)  Additional evidence

revealed that Petitioner flew to San Diego in March 2008 for a three-day trip, where he was met

by one of his California suppliers.  (*Id.* ¶ 23.)  Based on this and other information, the

Government executed a search of Petitioner's residence, during which they found $340,000 in

U.S. currency and several boxes and clips of ammunition (containing over 1,000 rounds).  (*Id.*

¶ 31.)  On top of all this evidence, Petitioner himself admitted that he knew a ketamine supplier

in California as far back as 2007, that he brokered ketamine deals for that supplier in the New

York area, that he would deposit funds in a New York bank into an account belonging to the

supplier (or his associate) to pay for the ketamine, that the deposits were to be in amounts less

than $10,000, and that the supplier would ship the ketamine to the recipient.  (*Id.* ¶ 29; Compl.

¶ 18.)

The evidence regarding the cash deposits made or caused to be made by Petitioner

represents the proverbial icing on the cake.  As outlined in the discovery, the Criminal

Complaint, and the Government Sentencing Memorandum, the Government had ample evidence

establishing that Petitioner was responsible for over 100 deposits totaling $752,080 into the

California suppliers' accounts between January 2007 and May 2008.  (*See* Gov't's Mem. in

Opp'n to Pet. ("Gov't's Opp'n") Ex. A (Dkt. No. 73).)  *Every one of these deposits* totaled less

than $10,000, to avoid financial reporting requirements, just as Petitioner admitted to doing. (*Id.*; PSR ¶¶ 28–30; Compl. ¶¶ 15(a)–(e), 17(a)–(d).)  Because these deposits reflected the payments for the ketamine, there is no doubt about the direct link between them and the quantity of ketamine distribution for which Petitioner was responsible.  Petitioner says nothing about these deposits in his submissions.  (*See generally* Pet'r's Mem.; Pet'r's Reply.)  Indeed, in support of his Petition, Petitioner offers no evidence contradicting the facts set forth in the PSR or the Criminal Complaint about his role in the offense conduct.  (*See* Pet'r's Mem. 18–24.) Furthermore, his papers are devoid of any citation to anything in the record that refutes the findings in the PSR and the other evidence in the record.  Instead, Petitioner merely offers his opinion about the credibility of a Government witness and some self-serving conjecture.  (*See* Pet'r's Mem. 19–21; Pet'r's Reply 2–3.).[7]

In the face of the overwhelming evidence the Government produced in discovery and otherwise proffered to the Probation Department, it hardly is surprising that Petitioner's counsel

---

[7] As the Government notes, Petitioner in particular offers his opinion about a letter the Government provided to Petitioner's counsel in January 2011.  (Pet'r's Mem. 19–22.)  In this letter, which was sent after Petitioner pled guilty, the Government noted that one of the California suppliers had said that on "one occasion in May 2008," the supplier stated that Petitioner had deposited approximately $150,000 in bank accounts as payment for ketamine and steroids.  (Gov't Opp'n Ex. F.)  However, the same letter further informed Petitioner that the supplier also said (in May 2008) that he sold Petitioner approximately 30–40 liters per month for seven months in 2007–08.  Petitioner selectively has embraced the former statement, claiming to interpret it as evidence that he bought a total of $150,000 worth of ketamine from the California supplier, but has expressed his view that the latter statement does not make sense.  (*See* Pet'r's Mem. 21–22.)

Petitioner also attempts to deflect responsibility for his role in the conspiracy by suggesting that the suppliers had other buyers.  (*Id.* at 22–24.)  Be that as it may, Petitioner admitted *to brokering* ketamine deals involving the California suppliers and to depositing the money for the ketamine deals into the suppliers' bank accounts.  (PSR ¶ 29.)  Thus, the fact that there were multiple buyers of the California ketamine hardly changes the legal responsibility Petitioner has for his role in arranging for sales to these buyers.

elected not to challenge the quantity of ketamine for which Petitioner was responsible, let alone

the dollar amount of the funds he laundered.  More importantly, the Court finds that their

apparent decision not to challenge the quantity and dollar amounts to be far from ineffective.  As

courts have repeatedly held, counsel are not required to make frivolous or unsupportable

arguments.  *See Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (emphasizing that counsel "need not

advance every argument, regardless of merit, urged by the [client]" (emphasis omitted));

*Williams v. United States*, No. 07-CV-1804, 2012 WL 1116403, at *14 (E.D.N.Y. Mar. 30,

2012) (finding counsel not ineffective for failure to pursue frivolous or non-meritorious claims).

Indeed, doing so merely undermines counsel's credibility and it is therefore better for lawyers to

be selective in the arguments they make.  *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("For

judges to second-guess reasonable professional judgments and impose on appointed counsel a

duty to raise every 'colorable' claim suggested by a client would disserve the . . . goal of

vigorous and effective advocacy . . . ."); *Vargas-De Jesus v. United States*, 813 F.3d 414, 419

(1st Cir. 2016) ("[The petitioner] has not shown that his counsel's failure to challenge the

quantity determination in the PSR resulted from an unreasonably deficient judgment.  Rather, the

record supports the conclusion that counsel's decision not to make that challenge reflected a

quite reasonable calculation of risk versus reward.").  For example, it would have been folly for

counsel to attempt to refute the evidence that Petitioner was involving in laundering $752,080

between January 2007 and May 2008, when the records clearly showed such.  *See Echevarria v.*

*United States*, 688 F. Supp. 2d 805, 811 (N.D. Ill. 2010) ("Since the drug quantities attributed to

[the petitioner] for purposes of his sentencing were not erroneous, his attorney was not

ineffective in failing to challenge the amounts.").[8]  As noted above, even if Petitioner could

challenge the quantity of ketamine distribution for which he was responsible, the amount of

laundered funds alone would have yielded the exact same Guidelines range as did the ketamine

conspiracy count.  Thus, Petitioner cannot even claim prejudice from counsel's decision not to

challenge the ketamine quantities.

### 2.  Pre-Sentence Confinement

Petitioner also claims that his trial attorneys were ineffective for failing to raise his pre-

sentence confinement issues as grounds for a below-Guidelines sentence.  (Pet'r's Mem. 24–26.)

The heart of this claim is that counsel erred in not asking the Court to consider as a mitigating

factor the fact that Petitioner was assaulted by an inmate and corrections officers while detained

in this case.[9]  While it is true that counsel did not raise this issue before the Court, there is no

prejudice from this decision as Petitioner himself raised this issue prior to the second sentence

---

[8] It is worth noting that Petitioner appears only to be critical of his first set of lawyers for their decision not to challenge the Guidelines calculations in the PSR.  He says nothing as critical about his third attorney, who represented Petitioner at the re-sentencing.  (*See* Dkt. (minute entry Oct. 9, 2012).)  This is curious as Petitioner had ample time, especially before the re-sentencing, to go over the discovery with counsel and prevail upon him to challenge the quantity of narcotics and the total amount of laundered funds.

[9] Petitioner also complains about the adjournments of the sentence that trial counsel sought.  According to Petitioner, these adjournments were unwarranted because their claims notwithstanding, counsel did not offer "a single objection or present mitigating evidence on their client's behalf."  (Pet'r's Mem. 24 (emphasis omitted).)  This is simply untrue, as trial counsel made an extensive record about Petitioner's attempts at cooperating with law enforcement officials and persuaded the Government not to forfeit Petitioner's residence.  Thus, there can be no claim that counsel was somehow ineffective for delaying the sentence. *See Knight v. Phillips*, No. 05-CV-2749, 2012 WL 5955058, at *11 n.18 (E.D.N.Y. Nov. 28, 2012) (rejecting claim for "ineffective assistance based on counsel's requests for adjournment" where the petitioner "failed to demonstrate that such requests were without 'tactical justification'" (quoting *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006))).

that the Court imposed (and that is the subject of this Petition) in a letter to the Court on July 22, 2012. (Dkt. No. 62.) And, in imposing the sentence it did, the Court explicitly acknowledged Petitioner's claims regarding the assaults he says he suffered while detained in this case, as well as the other confinement issues he raised in his letters to the Court, including various concerns he had about his medical care. (Re-Sentence Hr'g Tr. 25–27.) Thus, while the Court acknowledged that it had the discretion to impose a lower sentence because of these factors, (*id.* at 27), it determined these factors were outweighed by other factors, including Petitioner's recidivism, (*id.* at 27–28). Accordingly, because there is no probability that the sentence would have been different had counsel raised the same issue that Petitioner brought to the Court's attention, there is no prejudice from counsel's sentencing advocacy.[10]

### 3. Forfeiture Order

Finally, Petitioner claims that his trial attorneys were ineffective because of their recommendation that Petitioner sign the forfeiture order, which required Petitioner to forfeit $1,093,630 in U.S. currency and his personal vehicle. In particular, Petitioner claims that he was "incorrectly advised by counsel that the government would not be required to demonstrate a

---

[10] Petitioner also fails to acknowledge the arguments that counsel made in support of a below-Guidelines sentence, including Petitioner's efforts at cooperation. (*See generally* Pet'r's Mem.; Pet'r's Reply.) That Petitioner might disagree with counsel's strategic choices, of course, does not make good an ineffective assistance claim. *See United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986) ("A defendant, of course, may not claim ineffective assistance of counsel merely because in hindsight he thinks counsel's trial strategy was inadequate."); *United States v. Guerrero*, 882 F. Supp. 2d 463, 490 (S.D.N.Y. 2011) ("Merely disagreeing with counsel's strategy and finding it inadequate is not enough for a defendant to prevail on an ineffective assistance claim."), *aff'd*, 560 F. App'x 110 (2d Cir. 2014); *Robinson v. United States*, No. 03-CR-1501, 2010 WL 1789931, at *2 (S.D.N.Y. May 4, 2010) ("[A] petitioner cannot prevail on a claim of ineffective assistance simply because he disagrees with his counsel's strategy."), *reconsideration denied*, 2010 WL 3958423 (S.D.N.Y. Sept. 24, 2010).

nexus between the forfeited currency and property and that his conviction alone would suffice to sustain the forfeiture." (Am. Pet. 2.)

There are several fatal flaws with this claim. First, to the extent Petitioner is asserting that he was told by his trial lawyers that the Government could forfeit Petitioner's property even if not obtained as a result of his criminal conduct, that advice would not have been inaccurate, as the Government is allowed to forfeit substitute assets if it cannot locate property that reflects the proceeds of criminal conduct. *See United States v. Bermudez*, 413 F.3d 304, 306 (2d Cir. 2005) (holding that a defendant convicted of money laundering narcotics-related funds may be required to forfeit equivalent amount of money laundered "even where a defendant does not retain laundered property . . . so long as he conducted at least three separate transactions in any [12]-month period involving a total of $100,000 or more" (citing 18 U.S.C. § 982(b)(2))); *United States v. Jennings*, No. 98-CR-418, 2007 WL 1834651, at *2 (N.D.N.Y. June 25, 2007) ("Subsection 853(p) permits the Government to secure substitute assets to satisfy a forfeiture judgment, including a money judgment. By their very nature, substitute assets are not connected to the original crime." (citations and footnotes omitted)).

Second, Petitioner's claim fails because he signed the consent order of forfeiture, which explicitly provides that the currency and vehicle that he agreed to forfeit "were proceeds of the offense charged in Count One of the Indictment and therefore the value of this property should be credited against the $1,093,630 in United States currency, representing all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in the Indictment." (Consent Preliminary Order of Forfeiture 3–4 (Dkt. No. 44).) Thus, while Petitioner may now wish to assert, without any documentary or other evidentiary support,

that the forfeited property could not be traced to or was not the proceeds of his criminal conduct, he cannot prevail on a claim of ineffective assistance when he voluntarily signed the consent forfeiture order.  *See Kim v. United States*, No. 14-CV-3922, 2015 WL 4523217, at *3 (E.D.N.Y. July 27, 2015) (rejecting "arguments relating to the imposition of restitution and forfeiture" where the petitioner "entered into a plea agreement acknowledging that she had received money and property subject to forfeiture . . . and consenting to the entry of a forfeiture money judgment"); *Jones v. United States*, Nos. 12-CV-646, 10-CR-197, 2014 WL 657508, at *4 (S.D.N.Y. Feb. 19, 2014) (rejecting challenge to forfeiture judgment where the petitioner signed a plea agreement stipulating to amount of money to be forfeited); *accord Deese v. United States*, No. 13-CR-42, 2015 WL 6744107, at *5 (E.D.N.C. Nov. 4, 2015) (finding that counsel was not constitutionally ineffective in failing to contest the forfeiture of the petitioner's property because any "objections would have been baseless" in light of the petitioner's signed plea agreement consenting to forfeiture); *United States v. Watson*, No. 13-CR-8, 2015 WL 8606353, at *10 (E.D. Ky. Oct. 29, 2015) (finding "*Strickland* claim [to be] clearly without merit" where the petitioner failed to identify how any challenge to a restitution order or forfeiture "would have resulted in a different case outcome" "when he admitted the forfeiture amount was proper"), *adopted by* 2015 WL 8681167 (E.D. Ky. Dec. 11, 2015); *Chkir v. United States*, No. 08-CR-21, 2010 WL 2105465, at *5 (S.D. Ohio, May 25, 2010) (rejecting challenge to forfeiture order because the petitioner signed an agreement consenting to forfeiture and provided no evidence he did not voluntarily and knowingly enter into the agreement); *Santos v. United States*, No. 06-CV-522, 2007 WL 4149721, at *4 (D.R.I. Nov. 19, 2007) (finding "[the petitioner's] claim that his

counsel was ineffective in challenging the forfeiture of his real estate is foreclosed by his admissions" whereby the petitioner "expressly agreed to forfeit [the property]" (italics omitted)).

Given the state of forfeiture law and the undisputed facts noted herein, Petitioner has no argument that his counsel was ineffective in advising him to sign the consent forfeiture order. On the contrary, it was only through counsel's persistence that the Government backed off from its initial desire to forfeit Petitioner's residence. Indeed, in saving Petitioner's residence from becoming the Government's property, trial counsel made the very point Petitioner has made in his Petition: that the residence was not purchased with proceeds from the offenses of conviction and should not be subject to forfeiture. (*See* Gov't Opp'n Ex. E (Mar. 1, 2011 email from Tom Kenniff to AUSA Benjamin Allee).) Thus, it is simply not the case that counsel was in any way ineffective in representing Petitioner's interests.

Moreover, Petitioner has shown no prejudice from signing the forfeiture order. Had Petitioner refused to sign the order, the Government could have established at a hearing that the forfeiture amount was appropriate based on the deposit records, which laid bare the extensive money laundering transactions that totaled approximately $752,000, and the approximately $340,000 in cash that law enforcement recovered from Petitioner's home (along with steroids, a pistol case, and more than 1,000 ammunition rounds for different types of firearms). Indeed, given that Petitioner reported to the Probation Office that his only employment at the time of his arrest was working out of his home as a personal trainer and that he earned $600 per week from that job, (PSR ¶ 86), the Government would not have broken a sweat establishing the $340,000 in cash as wealth explained only by Petitioner's criminal conduct.

19

### 4. GPS Tracing Device

Finally, in his Reply Memorandum, Petitioner for the first time raises the claim that his trial lawyers were ineffective for failing to move to suppress the fruits of a GPS tracking device that law enforcement personnel placed on Petitioner's vehicle in 2008 without a warrant. (Pet'r's Reply 1–2.)  Putting aside the fact that the claim could be dismissed for first appearing in a reply submission, *see United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) (declining to "consider an argument raised for the first time in a reply brief"); *Barreras v. United States*, No. 13-CV-2075, 2016 WL 1464597, at *6 (S.D.N.Y. Apr. 12, 2016) ("Arguments may not be raised for the first time in a reply brief." (internal quotation marks omitted)); *Melo v. United States*, 825 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) (noting that "[the petitioner] waived [an] argument because he raised it for the first time in his [r]eply"), the claim is dismissed on the merits.

Law enforcement personnel placed the GPS device on Petitioner's vehicle in 2008 and used it as part of the investigation until May 2008, when Petitioner discovered it.  The Government did not seek a warrant before the placement of the tracking device.  Petitioner was made aware of the Government's use of the evidence in the Criminal Complaint.  (*See* Compl. ¶¶ 10–12, 15–16.)  Petitioner pled guilty in January 2010, without counsel having filed a motion to suppress the fruits of the tracking device.

There is no viable ineffective assistance claim based on the fact that counsel did not seek suppression of the fruits of the GPS tracking device.  It was not until January 2012 that the Supreme Court first held that placement of a GPS tracking device on a vehicle is a search under the Fourth Amendment.  *See United States v. Jones*, 132 S. Ct. 945, 949 (2012).  Indeed, it was not until August 2010, eight months after Petitioner pled guilty, that a circuit court first reached

the same conclusion.  *See United States v. Aguiar*, 737 F.3d 251, 256–58 (2d Cir. 2013)

(discussing the pre-*Jones* case law and noting that the D.C. Circuit's decision in *United States v.*

*Maynard*, 615 F.3d 544 (D.C. Cir. 2010), was the first one where a circuit court found that

placement of GPS tracking devices constituted a search under the Fourth Amendment).  Thus, at

the time Petitioner pled guilty, the clear consensus among the courts was that warrantless

placement of a GPS tracking device on vehicles was not a search.  *See Aguiar*, 737 F.3d at 256–

58 (collecting cases pre-*Jones*).  Accordingly, a motion to suppress brought before *Jones*, let

alone *Maynard*, likely would have met defeat on the grounds that the GPS placement did not

violate the Fourth Amendment.

Moreover, because the state of the law was such at the time counsel could have filed the

suppression motion, the Government very likely would have prevailed by invoking the good

faith doctrine.  *See Davis v. United States*, 564 U.S. 229, 241 (2011) ("Evidence obtained during

a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary

rule.").[11]  Indeed, this was the precise holding in *Aguiar*, where the Second Circuit held that the

---

[11] Petitioner also has failed to establish any prejudice from the absence of a suppression
motion.  Indeed, the fruits of the GPS tracking were only a small part of the Government's
evidence against Petitioner, as is clear from a review of the Criminal Complaint.  In addition to
the GPS-related evidence, for example, the Government had Petitioner's confession, other
surveillance evidence, bank records, seized narcotics and cash, and eyewitness testimony.  (*See,
e.g.,* Compl. ¶¶ 3–6, 13–18.)  Thus, the absence of the GPS tracking evidence would not have
made a dent in the Government's case.  *See Lopez v. Artus*, No. 03-CV-7087, 2005 WL 957341,
at *11 (S.D.N.Y. Apr. 25, 2005) ("The Second Circuit has suggested that when the evidence of a
defendant's guilt is overwhelming, the burden of demonstrating prejudice to satisfy the second
*Strickland* prong is virtually insurmountable."); *cf. Strouse v. Leonardo*, 928 F.2d 548, 556 (2d
Cir. 1991) (finding the court could not "say there is a 'reasonable probability' that had the
alleged errors in [counsel's] performance not occurred 'the result of the proceeding would have
been different,'" given that "[t]he evidence adduced at trial was so overwhelming" (quoting
*Strickland*, 466 U.S. at 694)).

*United States v. Sparks*, 711 F.3d 58, 66–67 (1st Cir. 2013) (holding that denial of suppression motion was appropriate because "at the time of the GPS surveillance in this case, settled, binding precedent [in the Supreme Court] . . . authorized the agents' conduct"). Thus, Petitioner's assertion of ineffective assistance fails.

### III.  Conclusion

For the reasons discussed above, the Court dismisses the Petition.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and finding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close this case.

SO ORDERED.

DATED:          September __, 2016
                      White Plains, New York

                                                        _____
                                                        KENNETH M. KARAS
                                                        UNITED STATES DISTRICT JUDGE

23

*United States v. Sparks*, 711 F.3d 58, 66–67 (1st Cir. 2013) (holding that denial of suppression motion was appropriate because "at the time of the GPS surveillance in this case, settled, binding precedent [in the Supreme Court] . . . authorized the agents' conduct"). Thus, Petitioner's assertion of ineffective assistance fails.

### III. Conclusion

For the reasons discussed above, the Court dismisses the Petition.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and finding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close this case.

SO ORDERED.

DATED:     September 29, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

23